UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
ABRAHAM FREUD,                                          Index No.: 21-cv-02281
                                                                    (MKY)(BR)

                                           Plaintiff,        **AMENDED COMPLAINT**

            -against-                                        ***Jury Trial Demanded***

THE NEW YORK CITY DEPARTMENT OF EDUCATION,
DOROTHY COLLINS, individually and in her official
capacity, RUDY E. GIULIANI, individually and in his official
capacity, and MARJORIE DALRYMPLE individually and in
her official capacity,

                                           Defendants.
--------------------------------------------------------------------------X

       Plaintiff, ABRAHAM FREUD, by and through his attorneys, RAISER AND KENNIFF,

P.C., respectfully alleges, upon knowledge as to himself and his own actions, and upon

information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff, Abraham Freud (hereinafter "Plaintiff"), is a 42-year-old Orthodox Jewish male

    and a resident and domiciliary of Cedarhurst, New York. Plaintiff, a Special Education

    teacher, alleges discrimination and retaliation by Defendants based on Plaintiff's religion,

    and Plaintiff's religious practices.

2.     As more fully set forth below, Plaintiff is employed by Defendant, the New York City

    Department of Education (hereinafter "Defendant DOE") as a Special Education Teacher

    at the District 75 Public School 369 at Public School 67 (hereinafter "P369@P67K").

3.     Defendant, Dorothy Collins (hereinafter "Defendant Collins") was Plaintiff's supervisor

    and Assistant Principal at P369@P67K from on or around 2004 to June 30, 2019.

4.      Defendant, Rudy E. Giuliani (hereinafter "Defendant Giuliani") was Plaintiff's

supervisor and Principal at P369@P67K from on or around 2001 to on or around

February 2018.

5.      Defendant, Marjorie Dalrymple (hereinafter "Defendant Dalrymple"), was Plaintiff's

supervisor and Principal at P369@P67K from on or about February 2018 to the present.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over Plaintiff's Federal claims pursuant to 28 U.S.C.

§§ 1331 and 1343.

7.      The unlawful practices alleged herein were committed within the State of New York,

County of Kings. Upon information and belief, Defendant's principal place of business

and place of service is New York County, thus proper venue is in the Southern District of

New York. Accordingly, this action properly lies in the United States District Court for

the Southern District of New York, pursuant to 28 U.S.C. § 1391.

8.      The jurisdictional prerequisites of this lawsuit have been satisfied. Plaintiff filed a Charge

of Discrimination with the Equal Employment Opportunity Commission on or around

January 2020 and was issued a Notice of Right to Sue dated December 17, 2020 and

commenced this action within ninety days of its receipt.

9.      As these causes of action are ongoing, Plaintiff filed a Notice of Claim with the New

York City Department of Education, the City of New York, New York City Comptroller

and Corporation Counsel, New York City Law Department on June 9, 2021.

## PARTIES

10.     Plaintiff, ABRAHAM FREUD, at all times relevant herein was an "employee" of the

New York City Department of Education as defined by all relevant statutes.

11.     Upon information and belief, Defendant, THE NEW YORK CITY DEPARTMENT OF
        EDUCATION, was and still is a municipal corporation duly organized and existing under
        the laws of the State of New York, with its principal place of business located at 52
        Chamber Street, New York, NY 11209. At all relevant times herein, DOE was Plaintiff's
        "employer" as defined by all relevant statutes. Upon information and belief, DOE
        operated, maintained and controlled the public schools in the five boroughs of New York
        City. Moreover, DOE controlled and set the terms and conditions of employment for all
        teachers, principals, superintendents, clerks, and other employees of all public schools in
        the five boroughs of New York City.

12.     Upon information and belief, Defendant, DOROTHY COLLINS, at all relevant times
        herein was the Assistant Principal of P369@P67K from 2004 to June 30, 2019 and
        Plaintiff's supervisor as well as an agent of the Defendant DOE.

13.     Upon information and belief, Defendant, RUDY E. GIULIANI, at all relevant times
        herein was the Principal of P369@P67K from on or around 2001 to on or around
        February 2018 and Plaintiff's supervisor as well as an agent of the Defendant DOE.

14.     Upon information and belief, Defendant, MARJORIE DALRYMPLE, at all relevant
        times herein was the Principal of P369@P67K from on or around February 2018 to
        present and Plaintiff's supervisor as well as an agent of the Defendant DOE.

## FACTUAL ALLEGATIONS

15.     Plaintiff commenced employment with Defendant DOE on or around September 2001.

16.     Since on or around 2004, Plaintiff has been employed at the Defendant DOE's
        P369@P67K as a Special Education classroom teacher.

17.     P369@P67K is a specialized District 75 school which deals with multiple disciplinary problems of special needs and autistic populations.

18.     As a Special Education teacher, Plaintiff teaches a special class with a 6:1:1 ratio, which includes fourth and fifth grade students and includes two (2), one-to-one paraprofessionals and one classroom paraprofessional.

19.     Upon information and belief, of all those employed at P369@P67K by Defendant DOE, Plaintiff is the only practicing Orthodox Jewish full time Special Education classroom teacher.

20.     Over the course of his tenure with Defendant DOE, Plaintiff has proven himself to be a capable, highly organized and dependable employee as exemplified by the many positive annual professional performance reviews and teacher observation reports he has received throughout his career.

21.     Despite Plaintiff's exemplary job performance, Plaintiff has become a target of, and has been callously and purposely discriminated against by, Defendant DOE, Defendant Collins, Defendant Giuliani and Defendant Dalrymple on the basis of his religion.

22.     Moreover, Plaintiff has been repeatedly retaliated against by Defendants after his voluminous complaints of discrimination to Defendant Giuliani, Defendant Dalrymple, Defendant Collins, Plaintiff's Union Representatives, and countless other agents of the Defendant DOE. Furthermore, Plaintiff has been repeatedly retaliated against for his complaints of the blatant discrimination to the United States Department of Education, Office of Civil Rights and the New York State Human Rights Commission.

*Harassment and Hostility*

23. Since Plaintiff's employment commenced with Defendant DOE in 2001, and as a practicing and devoted Orthodox Jew, Plaintiff requires off on the Jewish Holidays to rightfully practice his faith. Additionally, every Friday afternoon, in accordance with his faith, Plaintiff is required to leave early in order to observe the Jewish Holiday of the Sabbath.

24. Throughout Plaintiff's employment with Defendant, Plaintiff did not leave early on Fridays during instruction, only leaving slightly earlier during bussing.

25. By way of history, many instances of the discrimination and retaliation Plaintiff suffered, and still suffers to this day, would occur either subsequently after or before Plaintiff was absent due to his religious observances.

26. On or around 2015, Defendant Collins, who upon information and belief received tenure that same year, began to make antisemitic statements towards Plaintiff. Moreover, Defendant Collins began to ferment a campaign against Plaintiff, and enlist others to drive Plaintiff from his employment by way of discrimination.

27. The aforementioned issues began when a student accidently damaged the only computer in Plaintiff's classroom. Plaintiff continuously requested that Defendant Collins provide a new computer for Plaintiff's classroom. After many failed requests to Defendant Collins, Plaintiff only received a computer in Plaintiff's classroom when the union became involved.

28. The replacement computer that was provided to Plaintiff was obsolete and did not run the programs necessary to educate Plaintiff's students.

29. During this time, Defendant Collins began to object to Plaintiff leaving school early on the Jewish Holidays and/or to observe the Sabbath. Defendant Collins then began to

make antisemitic comments towards Plaintiff that Plaintiff should find another job and
"Jews have it made".

30.  On or around March 24, 2016, Plaintiff was absent as a result of the Holiday of Purim.
Subsequently after the Holiday of Purim, Plaintiff received a biased and unfair evaluation
on or around April 2016. Plaintiff complained to the Principal at the time, Defendant
Giuliani regarding Defendant Collins' cruel treatment of Plaintiff which was evident in
her harsh administration and biased evaluation of Plaintiff. Nevertheless, notwithstanding
Plaintiff's complaints, Defendant Giuliani did not observe or agree to meet with Plaintiff
to discuss his grievances and concerns about Defendant Collins.

31.  On or around June 13, 2016, Plaintiff was absent as a result of the Holiday of Shavuot.
Following Plaintiff's observance of the Holiday of Shavuot, Plaintiff was approached by
the Union School Representative, Mr. Malaros (hereinafter "Malaros"). Malaros
communicated to Plaintiff that the Principal (Defendant Giuliani) and the Assistant
Principal (Defendant Collins) wanted Plaintiff out of the organization at all costs and they
were willing to offer Plaintiff a "deal".

32.  The "deal" included Plaintiff being rated as "highly effective" only if Plaintiff consented
to leave the Public School 369 organization, which is comprised of twelve (12) schools at
different locations. If Plaintiff did not consent to leave the Public School 369
organization, Plaintiff would be rated "unsatisfactory/ineffective".

33.  Defendant Giuliani's and Defendant Collins' "deal" placed Plaintiff in an unimaginable
position, leaving the Public School 369 organization would have a profound effect on
Plaintiff and his family. This would have caused Plaintiff to lose his Special Chapter 683
six-week summer school program, this program makes up 17.5% of Plaintiff's annual

salary. If Plaintiff did not agree, he would be rated "unsatisfactory/ineffective" which would have substantial negative effects to Plaintiff's profession as a Special Education Teacher and if Plaintiff remained at P369@P67K, Plaintiff would undoubtedly endure an increased hostile work environment and retaliation from the Defendants and their agents.

34.   Defendant Collins and Defendant Giuliani did not afford Plaintiff the accommodation of being transferred to one of the other eleven (11) locations of the Public School 369 organization. Upon information and belief, several other Special Education teachers, with union involvement, were afforded the ability to transfer to another location of the Public School 369 organization.

35.   On or around January 11, 2018 Plaintiff received a letter from Secretary, Ms. Valerie that Plaintiff was scheduled for a hearing based on several instances of insubordination. Upon information and belief this hearing was in connection with Plaintiff's constant emails and letters to Defendant Giuliani and Defendant Collins regarding Plaintiff's requests for a classroom key.

36.   Defendants were in full possession of Plaintiff's classroom key as Plaintiff was required to immediately return the key. Plaintiff's students were often locked out of the room for periods of over thirty (30) minutes during the winter with their coats and book bags on the floor and when Plaintiff was supposed to be conducting classroom instruction.

37.   The hearing scheduled for January 11, 2018, was adjourned several times and finally scheduled for January 22, 2018. Each time Plaintiff requested the specifics of the charges in writing, Defendants responded with only another adjournment date. Despite all of the adjournments as a result of Defendant Giuliani, Plaintiff requested an adjournment of the scheduled hearing as a result of Professional Development Workshops being scheduled

during the same time. Plaintiff's request for an adjournment was denied. Plaintiff was

forced to cancel three (3) Professional Development Workshops as a result of the hearing.

38.     In order to fulfill Plaintiff's license requirements, Plaintiff is required to take a certain

number of Professional Development Workshops totaling one hundred and fifty (150)

hours every five (5) years.

39.     During the hearing, District representative Ms. Frias was present and witnessed

Defendant Giuliani state on the record that, "when I get all of your (Plaintiff) letters I

throw them right in the garbage" and "you (Plaintiff) must really not like being at your

site".

40.     Following the hearing, Plaintiff received a disciplinary letter as a result of the hearing for

insubordination. Plaintiff was forced to sign said disciplinary letter before two (2) school

secretaries causing Plaintiff further humiliation. Plaintiff maintains that he signed the

aforementioned letter under intimidation and duress.

41.     Plaintiff sent a notarized rebuttal regarding the above-mentioned hearing. Following the

sent rebuttal, Defendant Collins confiscated Plaintiff's students' group worktable. This

made it impossible to deliver whole group math instruction. Plaintiff had to place

materials and manipulatives on the floor and was limited to instructing two (2) students at

a time.

42.     On or around February 26, 2018, Plaintiff's student M.B. fell asleep in class and was

deliberately woken up by Plaintiff's paraprofessional Sergey (hereinafter "Sergey"). M.B.

woke up enraged and had to be restrained by Sergey, while attempting to restrain M.B.,

Sergey accidentally dislocated M.B.'s shoulder.

43.     The Special Education teacher who taught M.B. the year prior was allowed to let M.B. sleep during class as he was medicated twice daily, however, when M.B. was in Plaintiff's class (the following year), Defendant Collins directed that M.B. was not allowed under any circumstances to sleep in class, although there were many times while M.B. was in Plaintiff's class that M.B. was woken up and he had to be physically restrained. After the aforementioned incident, Sergey was suspended. Despite Plaintiff contacting and leaving messages for the Department of Education's New York City Special Investigator several times in order to provide information in defense of Sergey, Plaintiff was never informed by the Administration that Sergey was suspended.

44.     On or around March 9, 2018, Defendant Collins at a staff lunch meeting changed her position on students' sleeping in class and stated that no child is to be woken up from sleeping in class and should not be restrained because of it.

45.      Following the incident, Plaintiff had a substitute paraprofessional for on or around two (2) months wherein Plaintiff was left with one (1) paraprofessional, Mark Samuels (hereinafter "Samuels"). Samuels came from Special Education program. Plaintiff asked Defendant Collins if he would receive another paraprofessional as his student M.B. required a 1:1, Defendant Collins' response was, "no, this is a 6:1:1 class and he (M.B.) does not get a para". This prevented Plaintiff and Samuels from conducting rotations in class as Samuels could not assist with classwork as he was supposed to work with M.B. one on one.

46.     To make matters worse, Defendant Collins instructed Samuels not to assist with M.B. whenever he was in crisis. Often times, Samuels refused to do his daily job and take M.B. to lunch or to the nurse for his medication and would often times spend his day in

Defendant Collins' office. Plaintiff frequently had to deal with M.B. on his own while trying to maintain his class.

47.     Moreover, during this time Defendant Collins promoted Ray Paul (hereinafter "Paul') to Dean. Paul was also given the position of Custodian's helper after regular school hours. Paul was not licensed or qualified for the position of Dean. As the Dean, Paul's role was to handle behavioral problems of students. The Deans prior to Paul had designated quiet behavioral classrooms they would bring the students to, however, Paul would walk around and enter the teachers' classrooms.

48.     On or around February 28, 2018, the day before Plaintiff was to be absent for the Holiday of Purim, Plaintiff's classroom was ransacked.

49.     On or around March 2, 2018 when Plaintiff returned from his absence, Plaintiff's classroom furniture was rearranged and thrown about his room. There were broken markers, candy wrappers left thrown around with the toys, the sand in the box was dumped over the toys, and Plaintiff's computer was damaged. Paul had full access to Plaintiff's classroom after school hours as the Custodian's helper. Plaintiff would often come into work in the morning to find student files opened or misplaced, missing or broken supplies which included the students' manipulatives that were used to help Plaintiff's students' learning abilities.

50.     On or around March 2, 2018, Plaintiff was berated in front of his students and paraprofessionals by Coordinator Ms. Tobito regarding cleaning Plaintiff's wall for the smart board installation, Plaintiff communicated that he was absent the day before as a result of the Holiday of Purim, nonetheless, Ms. Tobito responded with, "I don't care, you should have had this done".

51.     At the end of the school year, on or around June 2018, Plaintiff was relocated to another site for summer school 2018, for the second year in a row. Plaintiff was the only senior Special Education teacher to be moved to another site for summer school. Newly hired teachers and/or teachers with less seniority were afforded the ability to remain at their year-round school. This was extremely embarrassing for Plaintiff as a senior Special Education teacher.

52.     Plaintiff had to travel to the new school by bike, while leaving his car at his year-round school. The Administration was aware of the difficulty of parking surrounding other school locations.

53.     On or around August 9, 2018, Plaintiff was threatened with physical and bodily harm for parking in the school lot by the Head Custodian. Plaintiff was prevented from parking in the school lot that he had parked in for over twelve (12) years. Plaintiff, out of fear for his safety filed a police report as a result of the confrontation.

54.     On or around August 10, 2018 Defendant Darlymple emailed Plaintiff and stated that Plaintiff needed her permission to park his car for the summer and the following year, if Plaintiff was to be placed at another location again.

55.     During the 2018-2019 and 2019-2020 school years the hostility, harassment and retaliation from Defendant Collins continued and now the new Principal, Defendant Dalrymple was involved.

56.     During the beginning of the 2018-2019 school year, Plaintiff was denied a password for the Unique Curriculum, in comparison to the fully equipped technology and passwords that were assigned to all other teachers except for Plaintiff.

57.     Moreover, at the beginning of the 2018-2019 school year, Plaintiff was provided a
        schedule/program card which did not include any extracurricular activities for his
        students, contrast to most of the other teachers' schedules. Plaintiff's students were
        excluded from extracurricular activities such as gym, music, technology, and art class. It
        was extremely important that Plaintiff's high needs students received a form of physical
        activity. Defendant Collins was aware that Plaintiff's students were excluded from the
        above-mentioned activities and did not attempt to make any alternative accommodations.
        This continued until the end of the school year in June 2019.

58.     That same school year, Plaintiff was assigned an exceptionally challenging class with
        students who were not on his original roster. Plaintiff was not made aware of these
        particular students until they arrived in his room and were left there unattended.

59.     Moreover, Plaintiff was reassigned Samuels, for a second year in a row. Samuels had a
        history of sleeping in class or using his phone. Often times, Samuels would state he was
        going to use the restroom when, upon information and belief, he was in Defendant
        Collins' office reporting everything that was going on in Plaintiff's class.

60.     On or around September 14, 2018, following the Holiday of Rosh Hashanah, a brand-new
        student was dropped off at Plaintiff's classroom without any prior notification. Said
        student was in the middle of a crises when he was dropped off.

61.     Similarly, after Plaintiff's absence for the Holiday of Sukkott, another student was added
        to Plaintiff's class without any prior notification.

62.     Defendant Collins continued to assigned paraprofessionals to Plaintiff and directing them
        not to support Plaintiff. Plaintiff's paraprofessional Mr. Ibrahim refused to assist with a
        student that he was assigned to and communicated to Plaintiff that he was specifically

told not to help Plaintiff, despite Mr. Ibrahim having more success with that particular student.

63.   From on or about September 2018 to December 2018, Plaintiff was kept isolated and deliberately not scheduled for grade level meetings, as they were always scheduled when Plaintiff had a teaching conflict. Only after Plaintiff's numerous complaints was Plaintiff able to attend meetings wherein, he continually complained that he was being treated differently from the other teachers, particularly where curriculum was concerned.

64.   From on or about September 2018 to June 2019, Plaintiff was set up with a lunch teacher that was chronically late when picking up his class which in turn caused Plaintiff to have less of a lunchtime period for himself.

65.   From on or about September 2018 to May 2019, Plaintiff's students were denied possession of iPads, despite the other teachers having iPads for their students and even though one of Plaintiff's students short term goal objective requires the student to make use of an iPad to perform writing tasks.

66.   On or around November 9, 2018, Plaintiff was abruptly told to leave a scheduled Triennial IEP (Individual Education Program) meeting for his student J.D.R. by Coordinator Quirke, in front of the individuals attending the meeting, within twenty (20) minutes of the meeting starting, and to go back to Plaintiff's class. Plaintiff was assured coverage of his class by a member of the school-based support team located on the first floor so that Plaintiff may attend the meeting.

67.   Plaintiff's position was undermined in not having any input in the development of an IEP goal and prevented from conducting his role as the teacher on record as it pertains to the

legal requirement of goals being written. Without Plaintiff's knowledge and input, Coordinator Quirke established a newly created goal.

68.   Upon information and belief, no other Special Education teacher had ever been treated in such a way that they were not allowed to attend their own student's IEP meeting.

69.   From December 4, 2018, to on or around April 2019 Plaintiff sent notarized letters to Defendant Collins and Defendant Dalrymple mentioning instances of their antisemitic actions toward Plaintiff and included the issues relating to Plaintiff's religious observance, observations/rating, summer school displacement, and parking. Plaintiff never received a written response to those letters from Defendant Collins and Defendant Dalrymple. The letters that were sent were always accompanied by a written response and email from the New York City Department of Education Office of Equal Opportunity and Diversity Management stating that an anonymous person sent a complaint of discrimination on Plaintiff's behalf.

70.   On or around December 10, 2018, Plaintiff and the staff noticed a radiator leak that intensified throughout the day. Plaintiff reported the leak to the Custodian at least three (3) times that same day. On or around December 17, 2018 Plaintiff located where the leak in the radiator was coming from, at which time Plaintiff's paraprofessional Carmen Ortega reported the leak to Defendant Collins. Defendant Collins communicated to Carmen Ortega that she would take care of it.

71.   The aforementioned leak turned flood lasted for on or around a month wherein large parts of Plaintiff's classroom was submerged in puddles and the problem continued to worsen. This caused unsanitary and unsafe conditions in Plaintiff's classroom as Plaintiff's students were forced to work in and around the flood during school hours.

72.    On or around January 16, 2019, Harry, the Fire Chief of the school communicated to

Plaintiff stating, "I now have permission to fix the radiator", he continued to

communicate to Plaintiff, "today my boss okayed me to fix your radiator". Defendant

Dalrymple and Defendant Collins never visited Plaintiff's room or addressed Plaintiff

concerning the flood, notwithstanding Plaintiff's numerous complaints and letters to them

with photo proof of the condition of Plaintiff's classroom as a result of the flood.

73.    On or around February 14, 2019, Defendant Collins communicated to Plaintiff that, "I

will not be intimidated by your letters and I don't give a sh..t".

74.    On or around March 18, 2019, Defendant Collins stated to Plaintiff, "So Mr. Freud is this

the last week you're leaving early, because now they are changing the clocks", Plaintiff

responded, "yes, does that bother you", and Defendant Collins walked away incoherently

mumbling.

75.    On or around March 22, 2019, following Plaintiff's absence for the Holiday of Purim,

Defendant Collins entered the resource room where Plaintiff was teaching his students

and started criticizing Plaintiff in front of all of Plaintiff's students and staff. Defendant

Collins stated, "what are you doing", the students were doing work on the Star fall

program on the Smart Board. Defendant Collins then stated, "you need to be doing math

now!" Plaintiff communicated that "math starts in five (5) minutes I'm just finishing up

with ELA here", Defendant Collins then responded, "no excuses just because you're in

this room here". Plaintiff then communicated to Defendant Collins that "again you are

showing how biased you are which is all due to my religion," Defendant Collins smirked,

slammed the door and left.

76.     Again, on March 25, 2019 Defendant Collins entered Plaintiff's temporary classroom in rage stating, "what are you kids doing here", Defendant Collins then turned to Plaintiff and stated, "you need to see me later with an explanation".

77.     On or around March 2019, Plaintiff's paraprofessional Carmen Ortega noticed that Plaintiff's student report card grades were tampered with.

78.     On or around April 3, 2019, Plaintiff emailed Defendant Dalrymple emphasizing his complaint that his students' report card grades the prior marking period were tampered with, Plaintiff's student grades were lowered, and that although Defendant Dalrymple had been at the school for a week and a half, she had never addressed the issue with Plaintiff. On or around a month after Plaintiff's initial complaint, Defendant Dalrymple requested Plaintiff send a written statement. No prior investigation was conducted.

79.     On or around April 29, 2019, Plaintiff's former paraprofessional's (Sergey) trial was scheduled concerning the incident of excessive force on a student M.B. which occurred during Plaintiff's class, and which is more fully set forth above in Paragraphs 42-44. Prior to the trial, Plaintiff participated as a witness in support of his former paraprofessional. Plaintiff produced thirteen (13) pages of notes and a complete copy of his daily log which discredited Defendants and the administrations' credibility in the aforementioned case against Sergey. All three (3) counts of misdemeanors against Plaintiff's former paraprofessional were dismissed.

80.     Following Plaintiff's assistance in the aforementioned case against his former paraprofessional, Plaintiff has been subject to additional and more severe retaliation by the Defendants.

81.    On or around April 30, 2019, the school secretary Ms. Valerie entered Plaintiff's classroom and requested the students' permission trip slips. Plaintiff was not told that there was an upcoming trip as he is mostly excluded from pertinent information that Plaintiff's students are then penalized for.

82.    On or around May 20, 2019, Plaintiff was notified by the technology teacher that Plaintiff's class would be receiving iPads, at the time it was already almost the end of the year with four (4) weeks left of school.

83.    On or around May 22, 2019 Defendant Collins called Plaintiff on the classroom phone stating in a hostile tone that "anything you need, you have to go directly to me". Plaintiff responded and asked, "do you treat everyone like this", Defendant Collins responded with, "just people like you" and hung up the phone.

84.    On or around June 7, 2019 Plaintiff emailed the newly appointed Coordinator Cynthia Torres (hereinafter "Torres") regarding the iPads, supplies, technology, and furniture Plaintiff was missing in his classroom. Plaintiff and his students were unable to use any of the iPads as the iPads did not have the properly installed applications. Additionally, Plaintiff contacted Rachel Horowitz (hereinafter "Horowitz"), the technology instructor via text that the iPads were not operable. Plaintiff did not receive a response. Upon information and belief, all of the other classrooms were fully equipped with iPads with preloaded applications, charging stations, and safety/security storage boxes.  On or around June 17, 2019, Horowitz finally went to Plaintiff's classroom and downloaded the necessary applications for the iPads.

85.    Following Plaintiff's absence on June 10, 2019 for the Holiday of Shavuot, Defendant Collins entered into Plaintiff's classroom during his lunch period and asked, "do all you

Jews leave early from your job on Fridays", Plaintiff responded "yes", and Defendant

Collins turned towards the door and mumbled "you Jews have it made". Subsequent to

Plaintiff's absence, Plaintiff was assigned a very difficult class for summer school

wherein it was required he have four (4) paraprofessionals and only received two (2).

Defendant Collins and Defendant Dalrymple were responsible for the assignment of

students and the staff.

86.   Again, Plaintiff was relocated to another site for summer school 2019, for the third year

in a row. Plaintiff was the only senior Special Education teacher to be moved to another

site for summer school. Newly hired teachers and/or teachers with less seniority were

afforded the ability to remain at their year-round school. This was extremely

embarrassing for Plaintiff as a senior Special Education teacher.

87.   A complaint was submitted by Plaintiff to the United States Department of Education,

Office of Civil Rights, (Case No. 02-19-1194), alleging that the staff at the New York

City Department of Education (hereinafter "NYCDOE") District 75 Public School 369 at

Public School 67 discriminated against students in Plaintiff's special education class, on

the basis of their disabilities, by failing to provide students with the following related aids

and services during school year 2018-2019: mandated occupational therapy (OT)

sessions, substitute one-to-one paraprofessionals, the use of iPads, failing to promptly

address a radiator leak and resulting flood in Plaintiff's classroom, excluding students

from a School trip to a Christmas tree lighting ceremony, and failing to invite NYCDOE

administrators to a publishing party held in Plaintiff's classroom during school year

2018-2019.

88. On or around August 15, 2019, Plaintiff submitted an additional complaint form to the United States Department of Education, Office of Civil Rights to add to the above-mentioned complaint (Case No. 02-19-1194).

89. The new complaint reinforced Plaintiff's complaints of, including but not limited to, the grade changing allegations by way of adding additional information. Upon information and belief, Ms. Yolanda DeJesus, a paraprofessional working at P369@P67K reported that Defendant Collins tampered with both student grades and test scores.

90. Additionally, Plaintiff complained that Ms. Adams, a special education teacher at P369@P67K, was provided the same paraprofessional for several years including summer school. Plaintiff, however, has had his paraprofessionals changed every year. During the summer school year, Plaintiff had four (4) students requiring 1:1 paraprofessional, although Plaintiff only had two (2) paraprofessionals to work with. Of the paraprofessionals Plaintiff had during the summer school year, Plaintiff was provided with new paraprofessionals during the regular school year.

91. Furthermore, Defendant Collins would afford Ms. Adams the ability to leave school early without signing out. According to Union representative, Malaros, there were multiple staff members who had more sick personal days in their bank that far exceeded the days that those staff members had off.

92. On or around August 21, 2019, a resolution agreement was drafted concerning Case No. 02-19-1194 wherein Defendants Collins and Defendant Dalryample, among other staff members and administrators, were to receive training by Defendant DOE regarding "ensuring the implementation of the provisions of an IEP deemed appropriate by a group of knowledgeable persons; and the procedures for obtaining compensatory OT services

when providers are absent or unavailable, and for documenting the provision of related aids and services during the implementation of an IEP".

93.   Despite the resolution agreement, Plaintiff continued to have complications with Defendants concerning his student's IEPs.

94.   On or around September 1, 2019, Plaintiff was assigned a new class that was made up of very low functioning and high maintenance students.

95.   From on or about September 2019 to March 2020, Plaintiff was the only classroom teacher at P369@P67K to have four (4) out of six (6) students assigned to 1:1 paraprofessional.

96.   Furthermore, from September 2019 to March 2020, two (2) of Plaintiff's assigned paraprofessionals had a history of suspensions as a result of using excessive force.

97.   That same school year, from September 2019 to March 2020, Plaintiff was the only Special Education teacher on the fifth floor who had students in pull-ups and students who were being toilet trained, yet there was no bathroom on the fifth floor. Though Plaintiff's class was on the fifth floor with no bathroom he had a student who required thirty (30) minute toileting schedule and another student requiring an hourly toilet schedule. As a result, Plaintiff had a student defecate in the classroom garbage pail and in the auditorium.

98.   On or around August 2020 Plaintiff requested a work from home accommodation which would allow Plaintiff to conduct remote learning instruction from his home. Shortly after, Plaintiff received a denial letter which did not specify the additional documentation Plaintiff would need to provide to receive the accommodation.

99.   Plaintiff received the denial letter notwithstanding Plaintiff's doctor stating that he suffers significant anxiety, claustrophobia, and depression and stating that it is in Plaintiff's best interest to teach from home for the duration of the pandemic. Plaintiff's doctor stated that Plaintiff would not fare well if he were to contract COVID-19 and would have difficulty providing direct care for special needs children with his heightened anxiety.

100.  Subsequent to the denial letter, Plaintiff resubmitted the same doctors note. Simultaneously, the school service provider emailed Plaintiff regarding a student and teaching in the classroom despite Plaintiff's requests to work from home.

101.  Plaintiff emailed Vivian Smalls, an attorney for the Department of Education's Office of Disabilities that the school was making plans for Plaintiff to come back notwithstanding his requests to work from home and without an official letter from the DOE. Vivian Smalls contacted Plaintiff to have a meeting with Defendant Dalrymple wherein Plaintiff responded via email "since when does a principal get involved in a medical decision". Approximately a week after Plaintiff emailed Vivian Smalls, Plaintiff received a response from Vivian Smalls that Plaintiff can work from home until December 2020. To date Plaintiff continues to work from home.

102.  While Plaintiff was absent for the Holiday of Sukkot on or around October 2, 2020, Plaintiff received notification that he was going to receive a student from Defendant Collins' school. Defendant Collins was transferred to another location of Public School 369 organization on or around June 30, 2019.

103.  Plaintiff received said student from Defendant Collins' school in his class. Defendant Dalrymple placed this student in Plaintiff's class despite knowing the difficult relationship between Plaintiff and Defendant Collins. Plaintiff did not receive the

student's proper IEP. Plaintiff had the student in his class for on or about three (3) weeks before the student was removed from his class.

104. While Plaintiff was observing the Sabbath on June 25, 2021, Plaintiff learned that he was assigned to a class in the school and is required to report back to the school on July 1, 2021, despite Plaintiff's accommodation request to work from home. Plaintiff was not notified properly of his new assignment and only learned of the assignment when he checked the roster.

105. Upon information and belief, all of the employees of Defendant DOE, including but not limited to Plaintiff's paraprofessional, were notified in a timely fashion whether or not they were approved for their accommodation to work from home.

106. Subsequent to Plaintiff's new assignment, Plaintiff contacted Vivian Smalls again to request the remote instruction accommodation. Instead of granting Plaintiff a work at home accommodation and despite knowing that Plaintiff was an unvaccinated individual and high risk of contracting Covid-19, Plaintiff was deliberately assigned to a remote class, however, inside the school building rather than from home. This was a retaliatory act against Plaintiff.

107. Plaintiff was not afforded the opportunity to present any further documentation, including from Plaintiff's physicians, prior to Defendant DOE's decision to require Plaintiff return in person to work.

108. As a result of the above-mentioned harassment, discrimination, hostile work environment and retaliation, Plaintiff has experienced unimaginable stress, depression, anxiety attacks, eating and sleeping disorders, waking up with the sweats, and severe headaches.

109.   Plaintiff has suffered severe emotional distress as a result of the discrimination he has suffered.

110.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against Defendants.

111.   It is clear that Defendants have a pattern and practice of discrimination.

112.   Defendants' on-going conduct is severe and pervasive.

113.   Plaintiff continues to be subjected to harassment for no other reason than on the basis of his religion.

114.   The above is just some of the examples of unlawful conduct to which Defendants subjected Plaintiff on an ongoing continuous basis.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

*(Violation of the Fourteenth Amendment Equal Protection Clause to the United States Constitution, Vindictive and Selective Enforcement of 42 U.S.C § 1983 and Title VII of the Civil Rights Act of 1964)*

115.   Plaintiff repeats and re-alleges each and every allegation contained herein.

116.   Defendants while acting under the color of law, unlawfully deprived the Plaintiff of his right to Equal Protection of the Laws, guaranteed by the Fourteenth Amendment of the United States Constitution, in that they engaged in selective enforcement of their own laws, rules, regulations, and ordinances against Plaintiff based upon the Plaintiff's religion and Plaintiff's constitutionally protected conduct. In so doing, Defendants intentionally and, with malicious or bad faith intent to injure Plaintiff, selectively treated Plaintiff differently from other similarly situated employees and acted with no rational basis for the difference in treatment. Defendants' conduct was intentional, conducted with bad faith, wholly irrational and arbitrary and to the detriment of Plaintiff.

117.   As a direct result of Defendants violation of the Plaintiff's Fourteenth Amendment rights of equal protection, Plaintiff has suffered irreparable harm for which there is no adequate remedy of law.

118.   Defendants' violation of Plaintiff's Fourteenth Amendment rights of equal protection under the law, as alleged herein above, Plaintiff has suffered and is entitled to recover compensatory and nominal damages, costs and attorneys' fees.

119.   These acts by Defendant DOE are in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Protection Cause of the United States Constitution.

120.   These acts by Defendant Collins, Defendant Giuliani, and Defendant Dalrymple are in violation of 42 U.S.C § 1983.

121.   These acts by the Defendants are in violation of the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

## SECOND CAUSE OF ACTION
*(Unlawful Discrimination on the Basis of Plaintiff's Religion in violation of*
*42 U.S.C § 1983 and Title VII of the Civil Rights Act of 1964)*

122.   Plaintiff repeats and re-alleges each and every allegation contained herein.

123.   By reason of the foregoing, the Defendants have unlawfully discriminated against Plaintiff as concerns his terms, conditions and privileges of employment, in that Defendants have created a hostile work environment, subjected Plaintiff to an atmosphere of adverse acts, and treated him disparately, because of Plaintiff's religion and good-faith opposition to discriminatory practices.

124.   These acts by Defendant DOE are in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Protection Cause of the United States Constitution.

125.   These acts by Defendant Collins, Defendant Giuliani, and Defendant Dalrymple are in violation of 42 U.S.C § 1983.

126.   These acts by the Defendants are in violation of the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

### THIRD CAUSE OF ACTION
*(Hostile Work Environment in violation of*
*42 U.S.C § 1983 and Title VII of the Civil Rights Act of 1964)*

127.   Plaintiff repeats and re-alleges each and every allegation contained herein.

128.   By reason of the foregoing, the Defendants have unlawfully discriminated against Plaintiff by subjecting him to a hostile work environment. This hostile environment was evidenced by the fact that Plaintiff was subjected to repeated harassment, retaliation and religious taunts. This toxic atmosphere continued for years despite Plaintiff's repeated complaints and requested assistance.

129.   This hostile work environment was severe and pervasive enough to interfere with the terms and conditions of Plaintiff's employment.

130.   Defendants subjected Plaintiff to continuous harassment for no other reason but for Plaintiff being the only practicing Orthodox Jewish within the P369@P67K organization.

131.   The hostility was both subjectively and objectively offensive enough to put Defendant DOE on notice that remedial action was required and were done in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Protection Cause of the United States Constitution.

132.   These acts by Defendant Collins, Defendant Giuliani, and Defendant Dalrymple are in violation of 42 U.S.C § 1983.

133.   These acts by the Defendants are in violation of the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

## FOURTH CAUSE OF ACTION
*(Violation of the First Amendment Right to Free Speech)*

134.   Plaintiff repeats and re-alleges each and every allegation contained herein.

135.   By reason of the foregoing, Defendants have unlawfully discrimination and retaliated

against Plaintiff as concerns to his terms, conditions and privileges of employment, in

that Defendants created a hostile work environment, subjected Plaintiff to an atmosphere

of adverse acts, and treated him disparately because Plaintiff spoke on matters of public

concerns as to the well-being of his students. These acts by Defendants are in violation of

Plaintiff's rights to free speech as guaranteed under the First Amended to the United

States Constitution.

136.   As a direct result of Defendants' violation of Plaintiff's First Amendment rights to

freedom of speech, as alleged herein above, Plaintiff has suffered damages, which are set

forth more fully below.

137.   These acts by the Defendants are in violation of the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

## FIFTH CAUSE OF ACTION
*(Retaliation in violation of 42 U.S.C § 1983 and Title VII of the Civil Rights Act of 1964)*

138.   Plaintiff repeats and re-alleges each and every allegation contained herein.

139.   As a direct result of Defendants' retaliation against Plaintiff, as alleged herein above,

Plaintiff has suffered damages, which are set forth more fully below.

140.   These acts by Defendant DOE as set forth herein constitute retaliation and against

Plaintiff and are in violation of Title VII of the Civil Rights Act of 1964, as amended, and

the Equal Protection Cause of the United States Constitution.

141.   These acts by Defendant Collins, Defendant Giuliani, and Defendant Dalrymple as set

forth herein constitute retaliation and are in violation of 42 U.S.C § 1983.

142.   These acts by the Defendants are in violation of the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

WHEREFORE, the Plaintiff demands Judgement against the Defendants for all

compensatory, emotional, psychological and punitive damages, lost compensation, front pay,

back pay, liquidated damages, injunction relief, and any other damages permitted by law

pursuant to the above referenced causes of action. It is respectfully requested that the Court grant

the Plaintiff any other relief to which he is entitled, including but not limited to:

1.   Awarding attorneys' fees and the costs and disbursements of this action.

2.   Granting such other and further relief that to the Court seems just and proper.

Further, Plaintiff demands a trial by jury.

Dated: Mineola, New York
July 1, 2021


RAISER AND KENNIFF, P.C.
*Attorneys for Plaintiff*
300 Old Country Rd, Suite 351
Mineola, New York 11501
(516) 742-7600

*Anthony Colleluori*
Anthony J. Colleluori

## **INDIVIDUAL VERIFICATION**

STATE OF NEW YORK    )
                                 ) ss.:
COUNTY OF NASSAU    )

Abraham Freud, being duly ~~sworn~~ *AFFIRMED*, states that he has reviewed the foregoing Verified Amended Complaint and that the contents of said Amended Complaint are true to his own knowledge, except in matters stated to be alleged upon information and belief, and, as to those matters, he believes them to be true.

_____
Abraham Freud

Duly ~~sworn~~ *AFFIRMED* before me
this _1ST_ day of _JULY_ , 2021

_____
NOTARY PUBLIC

GEDALIAH JAWITZ
Notary Public - State of New York
No. 02JA6115681
Qualified in Nassau County
My Comm. Expires December 3, 2024