UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/25/2022

---

ABRAHAM FREUD,

                  Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, DOROTHY COLLINS individually
and in her official capacity, RUDY GIULIANI,
individually and in his official capacity, and
MARJORIE DALRYMPLE individually and in her
official capacity,

                  Defendants.

1:21-cv-2281 (MKV)

**OPINION AND ORDER
GRANTING MOTION TO
DISMISS**

---

MARY KAY VYSKOCIL, United States District Judge:

    *Pro se* Plaintiff Abraham Freud, a special education teacher, claims that Defendants the

New York City Department of Education (the "DOE"), and Rudy Giuliani, Marjorie Dalrymple,

and Dorothy Collins (the "Individual Defendants") discriminated against him as an Orthodox

Jewish man, and retaliated when he complained of the disparate treatment of him and his

students.  The Defendants have moved to dismiss Plaintiff's Amended Complaint [ECF No. 39].

In support, Defendants filed a memorandum of law [ECF No. 40] ("Mem.").  Plaintiff has filed

an opposition [ECF No. 57] ("Opp."), to which Defendants have replied [ECF No. 58]

("Reply").  For the reasons discussed herein, Defendants' motion is granted.

**BACKGROUND[1]**

    In 2015, Defendant Collins "began to make antisemitic statements towards Plaintiff" and

belatedly provided an "obsolete" replacement computer to Plaintiff after his was damaged by a

---

[1] The following facts are taken from the Amended Complaint, unless otherwise noted, and are construed in the light most favorable to Plaintiff as the non-moving party.  *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020).

student.  Am. Compl. ¶¶ 26-28.  At the same time, Collins "began to object to Plaintiff leaving school early on the Jewish Holidays and/or to observe the Sabbath," stating "Jews have it made." Am. Compl. ¶ 29.  Following an absence for a holiday in March 2016, Plaintiff alleges he "received a biased and unfair evaluation" in April 2016, apparently from Collins.  Am. Compl. ¶ 30.  Following another holiday in June 2016, a third party union representative stated that Defendants Collins and Giuliani wanted Plaintiff "out of the organization" and wanted to make him an unfair "deal."  Am. Compl. ¶ 31.  Plaintiff thereafter was denied the ability to transfer to another public school.  Am. Compl. ¶ 34.

Plaintiff's next complains about an event in early 2018.  In January, Plaintiff was told that he was scheduled for a "hearing based on several instances of insubordination" which Plaintiff believes was "in connection with Plaintiff's constant emails and letters to Defendant Giuliani and Defendant Collins regarding Plaintiff's requests for a classroom key."  Am. Compl. ¶ 35.  After a few adjournments of the hearing date, Plaintiff's hearing took place less than two weeks following the receipt of the letter.  Am. Compl. ¶ 37.  The hearing was scheduled for a day that Plaintiff had professional development workshops, which he was forced to cancel.  Am. Comp. ¶ 37.  At the hearing, Giuliani allegedly stated that he throws out Plaintiff's letters when he receives them and that Plaintiff "must really not like being at [his] site."  Am. Compl. ¶ 39. The hearing resulted in a disciplinary letter, Am. Compl. ¶ 40, which Plaintiff rebutted with a notarized letter, Am. Compl. ¶ 41.  Collins thereafter "confiscated Plaintiff's students' group worktable."  Am. Compl. ¶ 41.

In February 2018, a student fell asleep in Plaintiff's class and was woken up by his para-professional.  Am. Compl. ¶ 42.  The student was "enraged" and had to be restrained by the para-professional, resulting in the dislocation of the student's shoulder.  Am. Compl. ¶ 42.  The para-

professional was suspended, and Collins directed Plaintiff that the student was not allowed to sleep in class, though Plaintiff contends that the student was permitted to sleep in class the previous year with a different teacher.  Am. Compl. ¶ 43.  A few weeks later, Collins changed her position and stated that "no child is to be woken up from sleeping in class and should not be restrained because of it," and the charges against the para-professional were dropped almost a year later.  Am. Compl. ¶¶ 44, 79.  Following the suspension of his para-professional, Plaintiff worked with a substitute para-professional whom Collins had apparently instructed not to assist with the student who had been caught sleeping.  Am. Compl. ¶¶ 45-46.  Plaintiff requested an additional para-professional for this student, which Collins denied.  Am. Compl. ¶ 45.

Later in February 2018, Plaintiff was absent for the Jewish holiday of Purim.  Plaintiff alleges that the day before his absence his classroom was "ransacked."  Am. Compl. ¶ 48.  He returned to a classroom in disarray: "broken markers, candy wrappers left thrown around with the toys," and damage to Plaintiff's computer.  Am. Compl. ¶¶ 48-49.  Plaintiff believes that a non-party "Dean" was the culprit as the only person who had access to the room afterhours.  *See* Am. Compl. ¶¶ 47, 49.  Once back, Plaintiff was "berated" that his smartboard needed cleaning.  Am. Compl. ¶ 50.  When Plaintiff said that he was absent the day before for the Jewish holiday, the custodian told him "I don't care, you should have done this."  Am. Compl. ¶ 50.

At the conclusion of the school year in June 2018, "Plaintiff was relocated to another site for summer school[] for the second year in a row."  Am. Compl. ¶ 51.  This change meant that Plaintiff would leave his car "at his year-round school" and ride his bike to his summer school assignment.  Am. Compl. ¶ 52.  In August 2018, the head custodian of his year-round school "threatened [him] with physical and bodily harm for parking in the school lot."  Am.

Compl. ¶ 53.  The next day, Defendant Darlymple emailed Plaintiff explaining that he "needed permission to park his car for the summer and the following year."  Am. Compl. ¶ 54.

Plaintiff's raises a litany of complaints about the 2018-2019 school year.  That year, he was "assigned an exceptionally challenging class," again with the substitute para-professional which he believes was unhelpful.  Am. Compl. ¶¶ 58-59, 62   He was also assigned lunch duty with a "chronically late" teacher.  Am. Compl. ¶¶ 64.  His special needs students were also "excluded from extracurricular activities such as gym, music, technology, and art class," and the use of iPads for months.  *See* Am. Compl. ¶¶ 57, 65, 82.   In addition, Plaintiff states that he was also "denied a password for the Unique Curriculum," given to other teachers.  Am. Compl. ¶ 56. From September to December 2018, Plaintiff "was kept isolated and deliberately not scheduled for grade level meetings, as they were always scheduled when [he] had a teaching conflict." Am. Compl. ¶ 63.  He also believes he was denied the opportunity to attend student Individualized Education Plan ("IEP") meetings, for example in November 2018, when he was told that he could return to class twenty minutes after the meeting began.  Am. Compl. ¶¶ 66-67. In December 2018, a radiator in Plaintiff's classroom began to leak.  Am. Compl. ¶¶ 70-71.  The leak was fixed a little over a month later by the school's "Fire Chief," who commented that "today my boss okayed me to fix your radiator."  Am. Compl. ¶¶ 71-72.  Plaintiff was chastised by Collins in March 2019 because the students should have been studying math at the time she entered Plaintiff's classroom, though Plaintiff says math time started five minutes later.  Am. Compl. ¶ 75.  During that interaction, Plaintiff told Collins she was "again [] showing how biased you are which is all due to my religion," causing her to smirk and slam the door.  Am. Compl. ¶ 75.  That same month, Collins asked Plaintiff if "this [is] the last week you're leaving early, because now they are changing the clocks."  Am. Compl. ¶ 74.  When Plaintiff responded

"yes, does that bother you," Collins "walked away incoherently mumbling." Am. Compl. ¶ 74.

Plaintiff believes that a month later his students "report card grades were tampered with." Am.

Compl. ¶ 77. When Plaintiff inquired of Defendant Dalrymple about this apparent discrepancy

with he was requested to send a written statement. Am. Compl. ¶ 78. And in April 2019, a

school secretary entered Plaintiff's classroom and requested student permission slips for a trip

about which he claims he did not know about. Am. Compl. ¶ 81. At the end of the school year

in June 2019, Collins asked Plaintiff if "all you Jews leave early from your job on Fridays." Am.

Compl. ¶ 85. Plaintiff responded "yes," and Collins "mumbled 'you Jews have it made.'" Am.

Compl. ¶ 85.

From December 2018 to April 2019, "Plaintiff sent notarized letters to Defendant Collins

and Defendant Dalrymple mentioning instances of their antisemitic actions toward Plaintiff,"

including "issues relating to Plaintiff's religious observance, observations/rating, summer school

displacement, and parking." Am. Compl. ¶ 69. Plaintiff contends that he never received a

response from the Defendants, except that he would receive an e-mail from the DOE Office of

Equal Opportunity and Diversity Management "stating that an anonymous person sent a

complaint of discrimination on Plaintiff's behalf." Am. Compl. ¶ 69. In February 2019, Collins,

told Plaintiff that she "will not be intimidated by your letters and I don't give a sh..t." Am.

Compl. ¶ 73.

Summer 2019 brought similar issues. Plaintiff was "assigned a very difficult class for

summer school," and was assigned only two para-professionals, rather than the four he believes

was necessary. Am. Compl. ¶ 85. He was again "relocated to another site," while other teachers

with less seniority "were afforded the ability to remain at their year-round school," which

Plaintiff found "extremely embarrassing." Am. Compl. ¶ 86. As best read, Plaintiff alleges that

he filed a complaint with the United States Department of Education Office of Civil Rights that summer for the discrimination "against students in Plaintiff's special education class, on the basis of their disabilities." Am. Compl. ¶¶ 87-89. In that complaint, Plaintiff alleged that a different special education teacher at his school "was provided the same paraprofessional for several years including summer school," while he was provided "with new paraprofessionals during the regular school year." Am. Compl. ¶ 90. That same teacher had "the ability to leave school early without signing out." Am. Compl. ¶ 91.

The 2019-2020 school year also frustrated Plaintiff. He was "assigned a new class that was made up of very low functioning and high maintenance students." Am. Compl. ¶¶ 94-95. His assigned para-professionals that year "had a history of suspensions as a result of using excessive force." Am. Compl. ¶ 96. Additionally, Plaintiff "was the only Special Education teacher on the fifth floor," which had no bathroom, but his students were "in pull-ups [and] being toilet trained." Am. Compl. ¶ 97. Defendant Collins transferred to another school in June 2019. Am. Compl. ¶ 102.

In August 2020, Plaintiff requested an accommodation to work from home, which was denied via letter that "did not specify the additional documentation Plaintiff would need to provide to receive the requested accommodation." Am. Compl. ¶ 98. Plaintiff followed up the denial with a doctors note detailing reasons for the accommodations, and reached out to an attorney for the DOE. Am. Compl. ¶¶ 99, 101. The attorney responded that he would have a meeting with Defendant Dalrymple, the principal, to which Plaintiff responded "since when does a principal get involved in a medical decision." Am. Compl. ¶ 101. A week later Plaintiff was told he could work from home. Am. Compl. ¶ 101.

A year later Plaintiff was told that he was required to return to school.  Am.

Compl. ¶ 104.  When he reached out to the DOE attorney, he was told he could work with a

remote class from inside the school building, which Plaintiff concludes was "retaliatory."  Am.

Compl. ¶ 106.  As of the filing of this case, Plaintiff "continues to work from home."  Am.

Compl. ¶ 101.

## PROCEDURAL BACKGROUND

Plaintiff, by counsel, commenced this action on March 16, 2021.  [ECF No. 1].  At his

request, the Court granted Plaintiff leave to file an amended complaint, which Plaintiff did on

July 7, 2021.  [ECF No. 34].  Defendants then moved to dismiss.  [ECF No. 39].

Before Plaintiff's opposition was due, the Court received an *ex parte* motion from

Plaintiff's counsel to withdraw as attorney.  [ECF No. 46].  In sum, Plaintiff's counsel wrote that

the attorney-client relationship had deteriorated severely to the point that representation was no

longer possible.  After hearing from the Plaintiff, the Court authorized the withdrawal of counsel

and extended Plaintiff's time to oppose the motion to dismiss, pending a determination regarding

whether he would retain new counsel.  [ECF No. 48].  Thereafter, Plaintiff notified the Court he

intended to proceed *pro se* [ECF No. 51], and lodged his opposition.

## LEGAL STANDARD

On a motion to dismiss, the allegations in the complaint are accepted as true, and all

reasonable inferences must be drawn in Plaintiff's favor.  *McCarthy v. Dun & Bradstreet Corp.*,

482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh

the evidence that might be presented at a trial but merely to determine whether the complaint

itself is *legally sufficient*."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (emphasis

added).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In a case brought by a *pro se* plaintiff, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'"  *Nicholas v. Bratton*, No. 15-cv-9592 (JPO), 2019 WL 2223407, at *3 (S.D.N.Y. May 23, 2019) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). The Court may also consider factual statements made in the *pro se* Plaintiff's opposition to the motion to dismiss.  *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion.").  "Even in a *pro se* case, however, . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## DISCUSSION

Plaintiff brings five separate causes of action, each nested with a number of interrelated claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law (the "SHRL"), and the New York City Human Rights Law ("CHRL").  Am. Compl. ¶¶ 115-38.  Construing the Amended Complaint liberally, Plaintiff asserts the following: 1) a religious selective enforcement claim; 2) a Title VII, SHRL, and CHRL religious discrimination claim against the DOE; 3) a Section 1983, SHRL and CHRL religious discrimination claim against the Individual Defendants; 4) a Title VII, SHRL, and CHRL hostile work environment claim against the DOE; 5) a hostile work environment claim against the Individual Defendants pursuant to Section 1983, the SHRL, and the CHRL; 6) a retaliation claim against the DOE brought pursuant to Title VII, the SHRL and the CHRL; 7) a

retaliation claim against the Individual Defendants brought pursuant to Section 1983, the SHRL and the CHRL; and 8) a First Amendment retaliation claim against all Defendants.  *See* Am. Compl. ¶¶ 115-38; *see also* Opp. at 1.  The Court has carefully reviewed the Amended Complaint and has concluded that the causes of action fail to state a claim upon which relief can be granted.

## I.   NEW YORK'S NOTICE OF CLAIM REQUIREMENT BARS SHRL AND CHRL CLAIMS AGAINST THE DOE

New York's Education Law requires that Plaintiff file a notice of claim before commencing any action against the DOE.  *See* N.Y. Educ. Law § 3813(1).  The notice must be filed within ninety days after the claim arises, and plaintiff must allow thirty days to elapse before filing a complaint.  *Id.*  Plaintiff then must plead that the notice has been served and that defendant either neglected or refused to satisfy the claim.  *Id.*; *see also* N.Y. Gen Mun. Law § 50-e.  "Notice of claim requirements are construed strictly by New York state courts and failure to abide by their terms mandates dismissal of the action."  *AT&T v. New York City Dep't of Human Res.*, 736 F. Supp. 496, 499 (S.D.N.Y. 1990) (collecting cases).  The notice of claim requirement applies to state law claims—here the SHRL and CHRL—regardless of the fact that those claims are brought in federal court.  *See Felder v. Casey*, 487 U.S. 131, 151 (1988).

Plaintiff filed a notice of claim against the DOE on June 9, 2021.  Am. Compl. ¶ 9.  Reading it in light most favorable to Plaintiff, the Amended Complaint alleges that the final discriminatory act prior to the notice of claim occurred on October 2, 2020.  Am. Compl. ¶ 102. Plaintiff therefore was required to file his notice of claim by December 31, 2020 (*i.e.*, 90 days after October 2, 2020).  *See* N.Y. Educ. Law § 3813(1).

Plaintiff argues that Executive Order Number 202.8, promulgated by then-Governor Andrew Cuomo, tolled the time he had to file a notice of claim.  *See* Opp. at 3 (citing Exec.

Order No. 202.8).  That Order, issued during the height of the COVID-19 pandemic, "tolled" "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state."  Exec. Order No. 202.8 (March 7, 2020).  Subsequent Executive Orders further extended the tolling order through November 3, 2020, for a total of 228 days.  *See McLaughlin v. Snowlift Inc.*, 2021 N.Y. Misc. LEXIS 2794, at *5 (N.Y. Sup. Ct. May 20, 2021).  Assuming without deciding that the Executive Orders *did* in fact serve to toll or suspend Plaintiff's time to file a notice of claim, Plaintiff's notice nonetheless was untimely.  If the notice period were tolled through November 3, 2020, Plaintiff's notice would then have been due on February 1, 2021 (*i.e.*, 90 days after November 3, 2020).[2]  Plaintiff's failure to timely file a notice of claim bars his SHRL and CHRL claims against the DOE.  *AT&T*, 736 F. Supp. at 499 (the "failure to abide by the[] terms [of the notice of claim requirements] *mandates* dismissal of the action.") (emphasis added).  Plaintiff's state- and city-law claims against the DOE are therefore dismissed.

## II.    CERTAIN OF PLAINTIFF'S CLAIMS ARE TIME-BARRED

In a similar vein, the Court must determine whether Plaintiff alleges a series of discrete acts in his Amended Complaint, or whether the scattered allegations coalesce to form a practice and pattern of discrimination or retaliation.  This determination will guide the remainder of its decision: if the allegations are discrete acts, certain of them may be time-barred from consideration.

Plaintiff brings causes of action under Title VII, Section 1983, and the SHRL and CHRL. Claims brought under Title VII must be preceded by a complaint filed with the EEOC within 300

---

[2] Defendants calculate this date more generously as March 5, 2021.  *See* Reply at 1.  Though that date would be 120 days from November 3, 2020, Plaintiff's notice of claim was, in any event, also filed after that date, rendering the mathematical error immaterial.

days of the alleged unlawful practice.  *See* 42 U.S.C. § 2000e-5(e)(1); *Flaherty v. Metromail Corp.*, 235 F.3d 133, 136 n.1 (2d Cir. 2000).  Plaintiff pleads that he filed a complaint with the EEOC "on or around January 2020."  Am. Compl. ¶ 8.  In his opposition, Plaintiff states that the EEOC complaint was filed "in February 2020."  Opp. at 20.  Defendants append to their memorandum of law a complaint filed with the EEOC dated February 6, 2020.  Mem., Ex. A.[3] Plaintiff's Title VII discrimination and retaliation claims that accrued before April 12, 2019 (*i.e.* 300 days prior to the filing of the EEOC complaint) are time-barred.[4]

Plaintiff's Section 1983, SHRL, and CHRL claims are additionally subject to a three-year statute of limitations.  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Zambrano-Lamhaouhi v. DOE*, 866 F. Supp. 2d 147, 168 (E.D.N.Y. 2011) (collecting cases). Thus, any discrimination, retaliation, or selective enforcement claim brought under those statutes that occurred before March 16, 2018 (*i.e.*, three years prior to the filing of the initial Complaint) are also time-barred.

Certain events alleged in the Amended Complaint took place long ago.  The three-year statute of limitations bars any claims predicated on the following allegations: Collin's unspecified antisemitic comments in 2015, Am. Compl. ¶¶ 27, 29, Collins providing Plaintiff an obsolete computer in 2015, Am. Compl. ¶ 27, Plaintiff's April 2016 evaluation, Am.

---

[3] The Second Circuit has described the initial EEOC complaint as an "essential element" of the 'Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court."  *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (citing *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)).  Further, the EEOC complaint is incorporated by reference in the Amended Complaint, Am. Compl. ¶ 8, and is integral to it as a precondition to bringing this action.  *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021); *see also Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 591 (E.D.N.Y. 2013) ("Although plaintiff's EEOC charge was submitted by defendant, the Court takes judicial notice of plaintiff's EEOC charge on a motion to dismiss.") (cleaned up).  The Court therefore takes judicial notice of the EEOC complaint date as February 6, 2020.

[4] Defendants calculate this date differently, believing 300 days prior to February 6, 2020 to be March 7, 2019. Mem. at 7-8.  That date would be 336 days prior to February 6, 2020.

Compl. ¶ 30, and the June 2016 "deal" offered to Plaintiff to leave the school union, Am. Compl. ¶ 31; the January 2018 insubordination hearing, Am. Compl. ¶ 35, the confiscation of Plaintiff's student group worktable, Am. Compl. ¶ 41, being assigned an allegedly subpar para-professional, Am. Compl. ¶ 45, the February 2018 "ransacking," Am. Compl. ¶ 48.

In addition to these allegations, the 300-day requirement pursuant to Title VII, running from the filing of the EEOC complaint, also time bars any claims predicated on the following allegations: the denial of parking at his year-round school during summer 2018, Am. Compl. ¶ 54, the alleged exclusion from grade level meetings through December 2018, Am. Compl. ¶ 56, the alleged exclusion from IEP meetings, Am. Compl. ¶ 63, the delay in fixing a radiator in January 2019, Am. Compl. ¶ 72, the March 2019 interaction with Collins, Am. Compl. ¶ 75, and the alleged grade tampering, Am. Compl. ¶ 77.  *See* 42 U.S.C. § 2000e-5(e)(1) (plaintiff can only allege incidents from 300 days before the filing of his EEOC charge).

Plaintiff argues that his claims are all timely, invoking the so-called continuing violation doctrine.  Opp. at 4-5.  Under that theory, "if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it."  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks and ellipsis omitted); *see also Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994).  The continuing violation doctrine is disfavored in this Circuit.  *See, e.g.*, *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) ("As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit."); *Curtis et al. v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 244 (S.D.N.Y.2000) (collecting cases) ("As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor.").

The continuing violation doctrine is inapposite in this case.  Plaintiff's Amended Complaint parades a laundry list of discrete acts, untethered from any relation to each other, each of which Plaintiff charges are discriminatory and/or retaliatory events.  Such "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Birch v. City of New York*, 675 F. App'x 43, 44-45 (2d Cir. 2017) (continuing violation doctrine did not apply to a complaint "based primarily on a series of discrete alleged retaliatory events such as punitive transfers, undesirable assignments, and poor performance reviews"); *Chin v. Port. Auth.*, 685 F.3d 135, 157 (2d Cir. 2012) ("Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."); *Kaur v. N.Y. City Health & Hosps. Corp.*, 688 F. Supp. 317, 338 (S.D.N.Y. 2010).  The Court therefore considers only those claims that are not time-barred with respect to Plaintiff's religious discrimination, retaliation, and selective enforcement claims.

Plaintiff's hostile work environment claims are, however, "different in kind from discrete acts."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010).  Because a hostile work environment claim "involves repeated conduct," the "'unlawful employment practice' . . . cannot be said to occur on any particular day."  *Id.*  The Court therefore will consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period . . . for the purposes of assessing liability."  *Id.*

## III.   PLAINTIFF FAILS TO STATE A SELECTIVE ENFORCEMENT CLAIM

A selective enforcement claim rests on the principles of equal protection found in the Fourteenth Amendment.  *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).  To prevail on a claim for selective enforcement, a plaintiff must show that:

"'(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999) (quoting *LaTrieste Rest.*, 40 F.3d at 590). Plaintiff's claim fails with respect to both elements.

A plaintiff must show that he was treated differently compared to others similarly situated as a "prerequisite" and a "threshold" matter to a selective treatment claim. *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004). Courts within this Circuit have held that individuals are similarly situated for purposes of selective enforcement claims when they are "similarly situated in all material respects." *Id.* at 696. A plaintiff's "naked assertions of discrimination" are insufficient to survive the pleading stage. *See Liang v. City of New York*, 2013 WL 5366394, at *11 (E.D.N.Y. Sept. 24, 2013).

The Amended Complaint fails to identify or describe any similarly situated employee. Sprinkled throughout the Amended Complaint are instances where Plaintiff believes he was treated differently from others. *See* Am. Compl. ¶¶ 43, 51, 56, 65, 68, 86, 97. But Plaintiff does not explain how the others—allegedly treated more favorably—were similarly situated to him. *See, e.g.*, Am. Compl. ¶ 63 (Plaintiff "continually complained that he was being treated differently from the other teachers."); *Iqbal*, 556 U.S. at 678 (conclusory statements insufficient). Indeed, with the limited exception of one teacher, Plaintiff does not actually identify any comparator. *See* Am. Compl. ¶¶ 90-92. Plaintiff's claim is underpinned by his belief that this other special education teacher "was provided the same paraprofessional for several years." Am. Compl. ¶ 90. But so too was Plaintiff. *See* Am. Compl. ¶ 59 (Plaintiff was assigned the same para-professional "for a second year in a row."). Plaintiff's contention that the teacher had "the

ability to leave school early without signing out" is unhelpful because Plaintiff never contends that *he* was denied that opportunity. *See* Am. Compl. ¶ 91. Further, Plaintiff never draws a cognizable nexus between the acts with which he takes umbrage and his religion, other than identifying himself with a protected class. *See Brisbane v. Milano*, 443 F. App'x 593, 595 (2d Cir. 2011) (identifying as a protected class, by itself, insufficient to meet the second prong of a selective enforcement claim); *see also Zahra v. Town of Southhold*, 48 F.3d 674, 684 (2d Cir. 1995). Plaintiff's selective enforcement claim therefore fails to state a claim upon which relief can be granted.

## IV.   PLAINTIFF'S RELIGIOUS DISCRIMINATION CLAIMS FAIL

There are two elements of a Title VII and the SHRL discrimination claim: (1) the employer discriminated against Plaintiff; and (2) the discrimination was *because of* Plaintiff's race, color, religion, sex, or national origin. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). At the pleading stage, the Plaintiff "must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Id.* at 86; *see also Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (SHRL claims governed by same standard as Title VII claim).

Plaintiff also brings his religious discrimination claim against the Individual Defendants under Section 1983. A claim will lie under Section 1983 against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1493. A public employee, like here, "may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." *Vega*, 801 F.3d at 87. Defendants do not allege that they were not acting "under color of state law." Thus, Section 1983 permits suit against the Individual Defendants. *Id.* Once a plaintiff meets the "color of law" requirement, the

Section 1983 "equal protection claim parallels his Title VII claim." *Id.* at 88 (internal citation omitted).  Thus, the Court applies the Title VII (and SHRL) standard to Plaintiff's religious discrimination claims under Section 1983 as well.  Plaintiff's religious discrimination claims fail under all statutes because he does not plead he was subject to any adverse action, or that his religion was a motivating factor for any purportedly adverse action.

An action is adverse if an employee "endures a materially adverse change in the terms and conditions of employment." *Id.* at 85.  The change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*  An action is "because of a plaintiff's religion" where religion "was a 'substantial' or 'motivating factor contributing to the employer's decision to take the action." *Id.* (cleaned up).  Plaintiff here must "plausibly allege facts that provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* at 86-87.  A plaintiff may do so by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.*  As with all other causes of action on a motion to dismiss, a "formulaic recitation of the elements . . . will not do." *Twombly*, 550 U.S. at 555.

The Court can identify very few instances of even potentially adverse employment actions.  With respect to purported adverse employment actions, Plaintiff directs the Court's attention to the failure to be provided a computer, a biased evaluation, the denial of a transfer, and not being provided a classroom.  Opp. at 10 (citing Am. Compl. ¶¶ 27-36).  For the reasons stated previously, the claims predicated on these actions are time-barred under both Title VII and Section 1983, and in any event do not equal adverse employment action. *Cf. Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (in the context of an ADA claim, "[w]hile negative employment evaluation letters, or reprimands may be considered adverse employment

actions, here there was no proof that this evaluation had any effect on the terms and conditions of [plaintiff's] employment" (citations and internal quotation marks omitted)); *Boyd v. Presbyterian Hosp.*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("Negative evaluations alone, without any accompanying adverse consequence are not adverse employment actions");

In addition, Plaintiff rehashes other individual grievances previously identified.  He alleges that he received an unfounded disciplinary letter.  Opp. at 11.  But "courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as decrease in pay or being placed on probation."  *Davis v. Goodwill Indus. of Greater N.Y. & N.J., Inc.*, 2017 WL 1194686, at *7 (S.D.N.Y. March 30, 2017); *Bernstein v. DOE*, 2020 U.S. Dist. LEXIS 209365, at *17 (S.D.N.Y. Nov. 9, 2020) (failure to allege negative consequences renders "disciplinary notice and disciplinary letters" not cognizable as adverse action) (collecting cases).

Plaintiffs seriatim allegations that he was made to move schools in the summer, received "disruptive students" or "very low functioning and high maintenance students" assigned to him, without the para-professional support to which he believes he was entitled are equally unavailing.  Opp. at 11-12 (citing Am. Compl. ¶¶ 42, 45-46, 51, 58, 60-62, 85-86, 94-95, 97-98).  It follows that "assignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . . the rate of pay and benefits remains the same."  *Rodriguez v. Coca Cola Refreshments USA, Inc.*, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases).  By Plaintiff's own statements, he is a "Special Education" teacher at a school that specializes and "deals with multiple disciplinary problems of special needs and autistic populations."  Am. Compl. ¶¶ 1, 17.  In other words, Plaintiff is engaged in the exact responsibility he was hired for: teaching special needs children who have "multiple disciplinary

problems."  The Court also notes that Plaintiff does not allege that other teachers were provided a *less* challenging class, or that any such assignment was a result of discriminatory animus.  In any event, a claim of unfair work assignments does not rise to the level of an adverse employment action unless Plaintiff shows that the assignments resulted in a "material detriment to the employee's working conditions" and not just a "mere inconvenience." *Ward v. Shaddock*, 2016 WL 4371752, at *5 (S.D.N.Y. Aug. 11, 2016) (citing *Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004); *Hubbard v. Port Auth. of N.Y. and N.J.*, 2008 WL 464694, at *11 (S.D.N.Y. Feb 20, 2008) ("Plaintiffs' allegations of excessive or unfair work assignments, without more, do not amount to adverse employment actions because they are not materially adverse changes in the terms or conditions of their employment.").

The alleged denial of a password for equipment, exclusion from grade level meetings, failure to provide iPads, and the "undermin[ing]" of his position by "not having any input in the development of an IEP" are also not adverse employment actions.  Opp. at 11 (citing Am. Compl. ¶¶ 56, 63, 67, 81-82).  With respect to the iPads, Plaintiff alleges he *did* receive them. Am. Compl. ¶ 82.  Plaintiff's allegation contradicts himself and, with respect to these actions, do not constitute material adverse action because they were not, individually, or collectively, a material detriment to his working conditions.  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (an adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal quotation marks omitted); *Shaddock*, 2016 WL 4371752, at *5.

Plaintiff's allegations further fail because they do not relate to any apparent discriminatory animus.  Plaintiff claims that the above-described actions "*could* show an inference of discrimination based upon an employer's preferential treatment towards a similarly

situated employee outside of the plaintiff's protected class, if properly plead." Opp. at 12 (emphasis added). But Plaintiff does not so properly plead. Notwithstanding that his complaint was filed while he was represented by counsel, and his counsel has already amended the complaint on his behalf, Plaintiff broadly paints his complaints as the result of being "an orthodox practicing Jew," without identifying any similarly situated employee. Opp. at 12. Plaintiff therefore has not provided the Court sufficient information to raise an inference of disparate treatment by virtue of his treatment compared to someone similarly situated to him. *Cf. Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (a "similarly situated" comparator requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, including acts of comparable seriousness.) Just as in Plaintiff's selective enforcement claim, the failure to allege facts giving rise to an inference of discrimination is fatal to his religious discrimination claims under Title VII, Section 1983, and the SHRL.

Because the standard is less exacting, discrimination claims brought under the CHRL must be analyzed separately. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109, 113 (2d Cir. 2013). To state a claim under the CHRL, a Plaintiff must allege that his "employer treated [him] less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. The CHRL must be construed "broadly in favor of discrimination plaintiffs." *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011). There must nonetheless be a showing that discriminatory reasons played some part in Plaintiff's being treated less well. As the Court explained in the context of Plaintiff's religious discrimination claims brought under Title VII, Section 1983, and the SHRL, Plaintiff's complaint puts forth no facts articulating how Plaintiff was treated "less well" than another employee by any of the Defendants. Further, as also explained above, Plaintiff's allegations that

his treatment in any measure was by virtue of his religious observances are wholly conclusory. Plaintiff's claim for discrimination under the CHRL therefore also fails.

## V.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS FAIL

Hostile work environment claims are subject to the same standard whether alleged under Title VII, Section 1983 or the SHRL.  *See Sosa v. DOE*, 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 312, 320-321 (2d Cir. 2015)).  "To establish a hostile work environment under Title VII . . . or § 1983, a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  At the motion to dismiss stage, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

In assessing the hostility of a work environment, the Court looks at the "totality of the circumstances."  *Patane v. Clark*, 508 F.3d at 113.  The Court considers "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance."  *Humphries v. City Univ. of NY*, 2013 WL 6196561, at *10 (S.D.N.Y. Nov. 26, 2013) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)).  The incidents of harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  The CHRL does not

impose a "severe or pervasive" bar at this stage, but a plaintiff must nonetheless link an adverse employment action to discriminatory motivation.  *See Lawson v. City of New York*, 2013 WL 6157175, at *14 (E.D.N.Y. Nov. 22, 2013), *aff'd* 595 F. App'x 89 (2d Cir. 2015).

**Frequency**.  The Court focuses on certain statements made by Defendant Collins, not addressed previously in the context of the religious discrimination claim.  In 2015, Collins commented "Jews have it made" when Plaintiff left school early.  Am. Compl. ¶ 29.  Four years later, in March 2019, Collins asked Plaintiff if "this is the last week you're leaving early, because now they are changing the clocks."  Am. Compl. ¶ 74.  In May 2019, Plaintiff was told that he should direct requests to Collins.  When Plaintiff asked if Collins "treat[s] everyone like this," Collins responded "just people like you."  Am. Compl. ¶ 83.  In June 2019, Collins asked Plaintiff "do all you Jews leave early from your job on Fridays," and again stated "you Jews have it made."  Am. Compl. ¶ 85.  On this motion, Plaintiff pleads only infrequent, episodic comments about his religious observances.

**Severity**.  Liberally construing all of these remarks as antisemitic, the remarks are insufficient to draw any reasonable, plausible inference of discrimination because they are not so severe or pervasive as to have altered the conditions of Plaintiff's employment.  *See Littlejohn*, 795 F.3d at 321; *Fleming v. MaxMara USA, Inc.*, F. App'x 115, 119 (2d Cir. 2010); *Zuckerman v. GW Acquisition LLC*, 2021 U.S. Dist. LEXIS 178873, at *20 (S.D.N.Y. Sept. 19, 2021) (applying *Fleming* on motion to dismiss).  Comments that "engender[] offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII."  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Comments that "engender[] offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII."  *Meritor Savings Bank, FSB*

*v. Vinson*, 477 U.S. 57, 67 (1986).  Instead, the comments are at worst "mere offensive utterances" that do not give rise to a plausible hostile work environment claim.

**Interference with work performance.**  Plaintiff's scattershot allegations of inconveniences identified previously with respect to his religious discrimination claims similarly fail to make out a claim for hostile work environment for the same reason: the identified acts did not "alter the conditions of the [his] employment."  *Littlejohn*, 795 F.3d at 320-21; *Fleming*, 371 F. App'x at 119 (no hostile work environment where "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her."); Am. Compl. ¶¶ 42, 45-46, 51, 56, 58, 60-63, 67, 81-82, 85-86, 94-95, 97-98. Indeed Plaintiff never pleads that the alleged conduct interfered with his work performance.

*       *       *

Construing it liberally, the Amended Complaint sets out four potentially antisemitic comments made over the span of four years by Defendant Collins.  Putting aside that Plaintiff's hostile work environment claim is asserted against *all* Defendants, the four—insensitive— isolated comments do not raise an inference of the requisite pervasive discrimination sufficient to change the conditions of Plaintiff's employment and entertain a hostile work environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (the "mere utterance of an . . . epithet which engenders offensive feelings in an employee, . . . does not sufficiently affect the conditions of employment to implicate Title VII"); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Generally, incidents must be more than

22

episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.")

(internal quotation marks and citations omitted)); *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d

Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct

(unless extremely serious) will not support a claim of discriminatory harassment."); *Ortiz v. Std.*

*& Poor's*, 2011 U.S. Dist LEXIS 99122 at *19-20 n.10 (S.D.N.Y. August 29, 2011)

("[P]lantiff's hostile work environment claim must be dismissed because it fails to state a claim

under even the more permissive []CHRL standard — that is, plaintiff does not show that he

experienced disparate treatment *because of* his age or disability.") (emphasis added).  Plaintiff's

hostile work environment claims therefore fail to state a claim upon which relief can be granted.

## VI.    PLAINTIFF'S RETALIATION CLAIMS FAIL

### A.    *Plaintiff's First Amendment Retaliation Claim*

A plaintiff claiming First Amendment retaliation must demonstrate that: "(1) his speech

addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a

causal connection existed between the speech and the adverse employment action, 'so that it can

be said that his speech was a motivating factor in the determination.'"  *Mandell v. County of*

*Suffolk*, 316 F.3d 368, 382 (2d Cir 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 109-10 (2d

Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir.

2012)).  At this stage, the Court "must be satisfied that such a claim is supported by specific and

detailed factual allegations, which are not stated in wholly conclusory terms."  *Velez v. Levy*, 401

F.3d 75, 97 (2d Cir. 2005).

Not all speech is protected by the First Amendment.  As an employee of the DOE,

Plaintiff must also establish that 1) he spoke as a citizen on 2) a matter of public concern.

*Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 504 (E.D.N.Y. 2011); *see Sousa v.*

*Roque*, 578 F.3d 164, 169-70 (2d Cir. 2009).  Speech is on a matter of public concern where it

relates "to any matter of political, social or other concern to the community." *Nagle v. Marron*, 663 F.3d 100, 106 (2d Cir. 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "Statements made pursuant to official duties are not protected." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Furthermore, "even if a public employee's speech is not required by, or included in, his job description, or made in response to a request by the employer, he speaks as an employee and not as a citizen if the speech is part-and-parcel of his concerns about his ability to properly execute his duties." *Id.* (alterations and internal quotation marks omitted) (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)). The determination of whether speech is protected is not a question of fact, but rather a question of law for the Court. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

The Court views Plaintiff's "Office of Civil Rights" complaint, which details grievances by Plaintiff with DOE staff's "failure to provide students with . . . aids and services" during the 2018-2019 school year, as speech not on a matter of public concern. Am. Compl. ¶ 87; *see also* Opp. at 16-17 (identifying his Office of Civil Rights complaint as concerning a matter of public concern). "[C]ourts have routinely held as a matter of law that a teacher's advocacy on behalf of her students falls squarely within her official duties as a teacher." *Ehrlich v. Dep't of Educ.*, 2012 U.S. Dist. LEXIS 17285, at *8-9 (S.D.N.Y. Feb. 6, 2012); *Woodlock v. Orange Ulster B.O.C.E.S.*, 281 F. App'x 66, 68 (2d Cir. 2008) (a counselor's complaint about "lack of physical education and art classes [was] made pursuant to her official duties as a special education counselor"); *Weintraub v. Bd. of Educ. Of the City Sch. Dist. of the City of NY*, 593 F.3d 196, 202 (2d Cir. 2010) ("[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employer's job description, or in response to a request by the employer."); *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178,

207 (E.D.N. Y. 2009) ("[C]omplaints concerning the lack of sufficient educational and instructional resources . . . are matters relating to [a teacher's] own job responsibilities as an educator," not public concern).  Here, the only allegations contained in the Amended Complaint are that Plaintiff advocated in his role as a special education teacher regarding matters relating to his job responsibilities.

Even if Plaintiff had spoken as a private citizen on a matter of public concern, Plaintiff's claim fails for the independent reason that no adverse action is connected to his speech.  "In the context of a First Amendment retaliation claim . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir. 2006) (citation omitted).  While not an exhaustive list, such adverse actions in the First Amendment retaliation context include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* at 226 (citation omitted).  At the pleading stage, Plaintiff must draw a causal connection between the alleged adverse action and the speech. *See Davis v. Goord,* 320 F. 3d 346, 354 (2d Cir. 2003) (the "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action.") (internal quotations marks and citation omitted).

Moreover, no plausible inference of retaliation follows the alleged complaint.  Plaintiff alleges that he filed the civil rights complaint on behalf of the students in his class in summer 2019. *See* Am. Compl. ¶¶ 87-89.  Scant allegations exist as to the post-complaint conduct of any of the Defendants.  Plaintiff complains that in the fall of 2019 he was assigned "a new class that was made up of very low functioning and high maintenance students," with students needing additional care, and with only two para-professionals.  Am. Compl. ¶¶ 94.  A year later, Plaintiff

was permitted to work from home.  Am. Compl. ¶ 101.  A year after *that*, Plaintiff alleges he was assigned to work remotely from inside the school as a "retaliatory act," notwithstanding that Plaintiff himself pleads that he continues to "work from home."  Am. Compl. ¶¶ 101, 106.  With respect to being assigned a difficult class and lack of support, it appears that this was a common gripe Plaintiff had year over year, including years pre-dating the lodging of his civil rights complaint.  *See* Am. Compl. ¶¶ 58-59, 64 (Plaintiff was assigned an "exceptionally challenging class" without his desired level of para-professional support in the 2018-2019 school year).  Put simply, no fact raises an inference that any conduct adversely impacted Plaintiff following the civil rights complaint, or that any Defendant took action in retaliation to protected speech. Plaintiff's First Amendment claim therefore fails to state a claim upon which relief can be granted.

## B.    *Plaintiff's Statutory Retaliation Claims*

To state a retaliation claim under Section 1983, Plaintiff must plausibly allege that defendants acted under the color of state law, that defendants took adverse employment action against Plaintiff, and that the adverse action was taken because Plaintiff complained of or otherwise opposed discrimination.  *Vega*, 801 F.3d at 91.  "[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII."  *Id.*  The same is true for retaliation claims brought under the SHRL.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 89, 113 (E.D.N.Y. 2011).

A *prima facie* claim of unlawful retaliation also must plead a causal connection between the adverse action and the plaintiff's protected activity.  *Barkley v. Penn Yan Central Sch. Dist.*, 442 F. App'x 581, 583 (2d Cir. 2011); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).  "The temporal proximity of events may give rise to an inference of retaliation,"

*El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010), and "[t]hough there is no bright-line rule on temporal proximity" courts in this Circuit have "held that a one to two month period between the protected activity and adverse employment action is generally sufficient to make a *prima facie* causation showing." *Rivera v. JPMorgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020).

Plaintiff broadly identifies four purported protected activities he engaged in that he alleges caused retaliation: 1) Plaintiff sent "notarized letters" to Defendants Collins and Dalrymple "mentioning instances of their antisemitic actions toward Plaintiff" between December 2018 and April 2019, Am. Compl. ¶ 69 and Opp. at 19; 2) Plaintiff filed the above-mentioned complaint with the Office of Civil Rights in the summer of 2019, Am. Compl. ¶ 87 and Opp. at 19; 3) Plaintiff filed "a charge of discrimination" with the EEOC in February 2020, Am. Compl. ¶ 8 and Opp. at 20; and 4) Plaintiff filed this lawsuit in March 2021, Opp. at 20. Plaintiff does not allege any retaliatory act plausibly caused by those protected activities.

As an initial matter, however, Plaintiff himself alleges that Defendant Giuliani left Plaintiff's school in "February 2018." Am. Compl. ¶¶ 4, 13, 55. Because Defendant Giuliani left before any allegedly protected activity, the Court dismisses the retaliation claim asserted against him. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (personal involvement is a prerequisite to the assessment of damages in a Section 1983 case).

### 1. *There is no plausibly alleged retaliatory act that followed Plaintiff's notarized letters*

Following an assiduous review of the Amended Complaint, the Court identifies the following complained of actions that occurred after Plaintiff's "notarized letters" to Defendants Collins and Dalrymple complaining about their offensive comments: 1) a delay in fixing a radiator in Plaintiff's classroom in December 2018, Am. Compl. ¶ 70; 2) the alleged tampering

with his student's report cards in April 2019, Am. Compl. ¶ 78; and 3) the assignment of a difficult class for summer school in 2019 at a new school site, Am. Compl. ¶ 86.[5]

Plaintiff pleads threadbare allegations that he sent "letters" from "December 4, 2018 to on or around April 2019," Am. Compl. ¶ 69, without specifying how many letters, when they were sent, or what complained-of conduct the respective letters referred to. The allegations are insufficient to suggest temporal proximity between the allegedly protected activity and the purported retaliatory acts. Nor are there sufficient allegations to raise an inference of casual connectivity.

At least with respect to the assignment of a difficult summer class, the three-month gap between the last notarized letter and the assignment does not raise an inference of a causal relationship. A three-month gap, standing on its own, is ordinarily insufficiently close to show causation, and "[c]laims of retaliation are routinely dismissed when as few as three months elapse between the protected [] activity and the alleged act of retaliation." *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (collecting cases); *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("District Courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.").

Moreover, none of the complained of actions plausibly rise to the level of retaliatory acts. The difficult class assignment is nothing more than Plaintiff not liking his job. Plaintiff is a

---

[5] The Court notes that Plaintiff pleads that following his assistance in defending his para-professional during an administrative hearing in the 2018-19 school year, he had "been subject to additional and more severe retaliation by the Defendants." Am. Compl. ¶ 80. The Court cannot consider his support for his para-professional as a protected activity for purposes of his retaliation claim because said support does not relate to any protected characteristic articulated by the Plaintiff. *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 682 (S.D.N.Y. 2012) ("Plaintiff's other claims – and potential claims – of protected activity are without merit, however, because they could not have been understood by management to have been about Plaintiff's protected characteristic.")

special education teacher.  Classes may, by nature, be more difficult.  Insofar as Plaintiff

complains about a radiator leak, Plaintiff acknowledges that once the source of the leak was

identified, Defendant Collins said "she would take care of it."  Am. Compl. ¶ 70.  Thereafter, the

school's "Fire Chief" fixed the radiator after his "boss okayed [him] to fix [it]."  Am. Compl.

¶ 72.  Plaintiff does not plead that the delay by the fire chief in fixing the radiator was at the

direction of any of the Defendants.  As to the grades, Plaintiff contends upon "information and

belief" that the tampering was effectuated by Defendant Collins Am. Compl. ¶ 89.  Plaintiff does

not, however, plead that the tampering was *because* he complained of discrimination in his

letters.  And the action does not constitute an adverse employment action.  *See Vega*, 801 F.3d at

91 (plaintiff must plausibly allege that an adverse employment action was "because he

complained of or otherwise opposed discrimination.").

### 2.    *No retaliatory act follows Plaintiff's Office of Civil Rights complaint, EEOC complaint, or this lawsuit*

With respect to the Office of Civil Rights complaint filed on behalf of his students in

summer 2019, the only subsequent action about which Plaintiff complains is the assignment of a

difficult class of students for the 2019-20 school year with poor para-professional support, Am.

Compl. ¶¶ 94-97.[6]  Plaintiff was assigned this class in September 2019.  Am. Compl. ¶ 94.  The

summer gap between the complaint and the class assignment precludes the raising of an

inference of a causal relationship between the two.  *Murray*, 528 F. Supp. 2d at 275.

The same analysis is true with respect to the complained of events following the filing of

Plaintiff's EEOC complaint and this lawsuit, in February 2020 and March 2021 respectively.

Plaintiff requested "to work from home," in August 2020, which was ultimately granted shortly

---

[6] Defendant Collins moved to a different school than Plaintiff on June 30, 2019.  Am. Compl. ¶ 103.  For that reason, allegedly retaliatory acts after that date cannot be attributed to her.

thereafter.  *See* Am. Compl. ¶¶ 98, 101.  Though Plaintiff's request was initially denied, that denial occurred more than six months after the filing of his EEOC complaint in February 2020. The two are not sufficiently proximate so as to raise an inference of a causal relationship. Further, though after the commencement of this lawsuit in March 2021 Plaintiff was asked to return to work in June 2021, Plaintiff pleads that he still works from home.  Am. Compl. ¶ 101. No adverse employment action could therefore plausibly have been taken against Plaintiff as retaliation for this lawsuit because, accepting his own allegations as true, his employment situation remains the same.

In his opposition, Plaintiff urges the Court to consider the Second Circuit's decisions in *Irrera v. Humphreys*, 859 F.3d 196 (2d Cir. 2017), and *Massaro v. Board of Education*, 774 F. App'x 18 (2d Cir. 2019).  In *Irrera*, the Second Circuit directed that district courts should employ "experience and common sense," and held that the plaintiff's claims could survive a motion to dismiss, reversing the district court's opinion that found, in part, that a two-year delay between the harassment and retaliation was insufficient to establish a causal relationship.  *Id.* at 198; *Irrera v. Univ. of Rochester*, 2016 U.S. Dist. LEXIS 203057, at *11 (W.D.N.Y. May 23, 2016).

In *Massaro*, a public school teacher alleged age-based discrimination and retaliation for an age-discrimination lawsuit.  *Massaro*, 774 F. App'x at 19-20.  In a summary order, the Second Circuit stated that a three-month gap between the alleged protected activity and the alleged retaliation did not fail to establish a causal connection because "judicial 'experience and common sense'" permitted "the Court to recognize that May to August is summer break."  *Id.* at 22.  Accordingly, the Court concluded that it was plausible "the start of a new semester[] was the school personnel's earliest opportunity to retaliate."  *Id.* at 23.

The logic of *Massaro* is inapposite here.  Plaintiff alleges that he worked during the summer for the same employer he alleges discriminated against him months later.  Am. Comp. ¶¶ 51, 54, 86.  To the extent they ever intended to, Defendants therefore did not need to wait for "the start of a new semester" as their "earliest opportunity to retaliate."  Opp. at 20; *Massaro*, 774 F. App'x at 23.  In this case, unlike in *Massaro*, the apparent delay over the summer in retaliatory acts cannot be excused by the summer break.  Accordingly, no plausible inference of retaliation arises because there is no gap for a summer break which would put temporal distance between the Plaintiff's protected activity and the purported retaliatory actions because Plaintiff continued to work for the same Defendants he alleges retaliated against him during that time.

*     *     *

To assert a claim for retaliation under the CHRL, a plaintiff "must show that [he] took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Quarless v. Brooklyn Botanic Garden Corp.*, 2014 WL 2767085, at *11 (E.D.N.Y. June 18, 2014). Significantly here, the complained of conduct by the Defendants did not chill Plaintiff's pursuit of his charge of discrimination.  Retaliation must plausibly "dissuade a reasonable worker from making or supporting a charge of discrimination," *Vega*, 801 F.3d at 91, or "likely [] deter a person from engaging in such action."  *Quarless*, 2014 WL 2767085, at *11.  Accepting Plaintiff's own allegations as true, Plaintiff in turn mailed several "notarized letters," filed an Office of Civil Rights complaint and a complaint with the EEOC, and ultimately commenced this lawsuit.  Plaintiff himself was not dissuaded from raising complaints.  In context, it does not appear that the conduct Plaintiff experienced would plausibly dissuade a reasonable worker from

making a charge of discrimination.  For the foregoing reasons, Plaintiff's retaliation claims fail to state a claim upon which relief can be granted.

## VII.   LEAVE TO AMEND

When this Court granted Plaintiff (then represented by counsel) leave to amend his complaint last June, Plaintiff was warned that his amendment would be the "*last opportunity to amend* the complaint in response to" the arguments raised in Defendants' letter for a pre-motion conference.  [ECF No. 30] (emphasis added).  Plaintiff (still represented by counsel) amended his complaint shortly thereafter.  [ECF No. 34].  The arguments Defendants raised in their letter are the *same* arguments raised on this Motion to Dismiss.  *Compare* ECF No. 24, *with* ECF No. 40.  Indeed, those same statute of limitations arguments were the basis for which Plaintiff (now *pro se*) sought an 11-day extension of his time to oppose the Motion, which the Court granted. [ECF No. 55].  Plaintiff does not ask for leave to amend if the Court concludes that it should grant Defendants' Motion to Dismiss.

"Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (internal quotation marks and citation omitted). Plaintiff has been afforded this opportunity.  *Ruotolo v. City of NY*, 514 F.3d 184, 191 (2d Cir. 2008) (leave to amend may properly be denied for "repeated failure to cure deficiencies by amendments previously allowed.").

## CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED.  Plaintiff's Amended Complaint is dismissed with prejudice.  The Clerk of the Court respectfully is requested to terminate the motion at ECF No. 39 and to close this case.

**SO ORDERED.**

Date:   **March 25, 2022**
  **New York, NY**

              **MARY KAY VYSKOCIL**
              **United States District Judge**